# UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: | ) |
| | ) |
| WILLIAMS RECYCLING, INC., | ) Case No. 12-50669-can7 |
|     Debtor. | ) |
| | ) |
| | ) |
| HARVEY WILLIAMS, et al., | ) |
|     Plaintiffs, | ) |
| | ) Adv. No. 13-05002-can |
| v. | ) |
| | ) |
| WILLIAMS RECYCLING, INC., et al., | ) |
| | ) |
|     Defendants. | ) |

## MEMORANDUM OPINION

In 1993, Harvey Williams transferred 12.5 acres of Missouri real estate to his Missouri corporation. Almost 20 years later, Mr. Williams sold the stock in his corporation to new parties, who later caused the corporation to file a Chapter 7 bankruptcy. Seller and buyer both agree they did not intend the 12.5 acre parcel to be part of the sale. Under these circumstances, may the sale agreement be reformed pursuant to the doctrine of mutual mistake to exclude the 12.5 acres as an asset of the corporation, over the objection of the corporation's Chapter 7 Trustee? Based on the evidence in this case, the answer is yes.

### *Jurisdiction*

All parties agree and the Court so finds that this Court has jurisdiction over this proceeding; that the proceeding is "core"; and that venue is proper. 28 U.S.C. § 1334(b), §§ 157(b)(2)(A), (E) and (O), §1408.

1

*Background*

Plaintiff Harvey Williams is 87 years old, and has been a resident of Northwest Missouri for some 43 years. Through a corporation he owned called H.D.W. Enterprises, Inc., Mr. Williams operated a trash service and recycling business in Northwest Missouri later known as "Williams Recycling."[1] Williams Recycling owned the real estate and other buildings (warehouse and recycling plant) on which it operated.

In December 1993, Mr. Williams transferred 12.5 acres (the "12.5 Acres")[2] of undeveloped land that he owned personally to his corporation. Mr. Williams testified believably that he was worried someone might get hurt on the rural land, and he wanted to have the 12.5 Acres covered under his corporation's insurance. Mr. Williams also testified believably that he forgot he had done so. Over the intervening years, Mr. Williams personally paid the real estate taxes and oversaw the upkeep of the 12.5 Acres, testifying that he had agreement with a neighbor to farm, maintain, and police the property. Williams Recycling, the business, did not use the 12.5 Acres in its operations, nor was the property contiguous or adjacent to Williams Recycling's other real estate.

*The Original Sale Agreement*

Sometime in late 2010 or early 2011, Mr. Williams, individually and in his capacity as Trustee of the Harvey Williams Family Trust U.D.T. dated August 6, 2006, agreed to sell the Williams Recycling business to buyers Larry Russell and Katherine Strough. The "Stock Purchase and Real Estate Purchase Agreement" and related sale documents (collectively, the "Agreement") were admitted into evidence and Mr. Williams as seller and Larry Russell as

---

[1] The sale contract and other documents this Court admitted into evidence all refer to Williams Recycling as "Williams Services." Throughout the course of this dispute and in their pleadings, the parties have referred to the business as "Williams Recycling." The difference is not relevant to the disposition of the case, except where noted, so for the ease of the parties the Court will refer to the business as "Williams Recycling."

[2] The legal description of the land is set forth on Exhibit A attached hereto and incorporated by reference.

2

buyer were allowed to testify about the Agreement, over the Trustee's standing objection based on the parol evidence rule.[3]

The Agreement, dated January 11, 2011, contains several provisions that the Court finds relevant to ascertaining the parties' intent:[4]

►*Recitals*

First, the Agreement itself is titled "Stock Purchase *And* Real Estate Purchase Agreement." (emphasis added). The recitals bear out that the parties' intent is for the buyer to acquire the stock, the business operations, and the specific real estate necessary to operate the business. Specifically, the first recital states that Mr. Williams and his Trust, defined collectively as "Seller," "is the owner and holder of 98 percent of the outstanding capital stock of a Missouri corporation known as H.D.W. Enterprises, Inc., which operates a trash service and recycling business throughout Northwest Missouri known as Williams Services, *and Seller further owns certain real estate which is used by Williams Services* as more particularly described herein." (emphasis added). The second recital states that "Buyers desire to purchase and acquire the stock *and real estate* and Seller desires to sell them the same on the conditions below." (emphasis added). What specific real estate is contemplated as necessary to operate the business is not described in the recitals, however.

►*Representations and Warranties Regarding Assets Being Sold*

Second, after the recitals, the Agreement is structured in a format commonly seen in simple asset-purchase agreements. In ¶ 1, the Agreement provides that Mr. Williams is selling

---

[3] The Court ruled preliminarily that the agreement and sale documents were ambiguous, and therefore that parol evidence could be admitted. The Court reaffirms that ruling, as will be discussed in more detail below.

[4] The Trustee's copy of the Agreement (Exhibit A) was unsigned and undated and lacked referenced exhibits, but is otherwise identical to the copy (Exhibit 102) submitted by Mr. Williams.

3

and Buyers are acquiring 98 shares of common stock.[5] With respect to representations relating to the assets being sold specifically, subparagraph (e) of ¶ 2, titled "**Assets and Title to Corporate Property**," states that "[a]ttached hereto and incorporated here by reference is a list of assets owned by the Corporation, and the Corporation has good and marketable title to all of its properties…"

The list of assets attached to the Agreement as Exhibit "A" lists various items, such as equipment, by locations on the business premises. For example, "a desk, 2 shelving units and an oil barrel dolly" are listed under the heading of the "OIL Room," indicating that those particular items are being sold as part of the sale. Most of the assets listed on Exhibit "A" are clearly intended to be transferred with the sale, with the exception of "Semi Van Trailers"; under this heading, Exhibit "A" states: "We are renting these from Bud. First right of refusal"; it is therefore not clear to the Court whether these assets were being sold, and there was no testimony specifically about these assets.

Disposition of other personal property, such as accounts receivable and inventory, is not provided in ¶ 2, nor are such assets listed on the Exhibit "A" to the Agreement but are, rather, discussed in ¶ 4, entitled "**Actions by Corporation Pending Closing**." This paragraph warrants Mr. Williams' continued operation of the business pending closing, and provides a date for determining ownership for accounts receivable:

> *Except as provided below*, all payments and funds received for services rendered prior to January 1, 2011, shall be set over and belong to Seller. Any payments and funds received for services rendered after January 1, 2011, shall remain property of the corporation.

¶ 4.d (emphasis added).

---

[5] The other two shareholders, each owning one share, relinquished their stock in writings attached to the Agreement, so that effectively 100% of the stock ended up being sold.

The exception is that Mr. Williams was allowed to retain one approximately $7,000 account receivable in addition to certain inventory: "[a]ll unfinished scrap and inventory including storages of cardboard, aluminum, tin, copper or other recyclable inventory shall remain property of Seller…"

►*Covenants*

Third, the Agreement contains covenants surviving the closing. For example, in ¶ 5, Mr. Williams agreed to a ten year covenant-not-to compete, and in ¶ 6, a one-year commitment to provide mentoring, advice, and assistance to Buyers as requested. This mentoring requirement includes a duty "to cooperate with Buyers to assure a smooth and orderly continuation of the corporate business including … no business interruption or loss of corporate clientele or employees."

►*Real Estate and Related Requirements*

Fourth, the Agreement contains a separate provision governing the sale of the "real estate." ¶ 7. **Real Estate.** Subparagraph 7.a. provides:

> In addition to the foregoing, Seller hereby agrees to sell and convey to Buyers and Buyers agree to purchase from Seller upon the terms and conditions hereafter set forth, *real estate described on Exhibit "B"* attached hereto, located in Nodaway County, State of Missouri…"

The legal description on the attached Exhibit "B" to the Agreement is blank.

With respect to title insurance, ¶ 7.b requires Mr. Williams to deliver to Buyers a commitment to issue an owner's policy of title insurance in the amount of the purchase price; this subparagraph also specifies that the cost of the owner's title policy would be paid by Mr. Williams, and that the cost of mortgagee's title policy, if any, would be paid by Buyers.

Subparagraphs 7.b, c. and d. deal with taxes, insurance and possession of the real estate, respectively. Subparagraph 7.e. **Inspection, Condition of Property and Warranties.**

5

acknowledges that the Buyers have had the opportunity to inspect the real estate and its improvements:

> Buyers hereby acknowledge that prior to execution of this contract, Buyers have inspected the property and the improvements located thereon. Buyers further understand that they are purchasing the property and improvements located thereon in an "as-is" condition. It is specifically agreed that Seller has made no representations or warranties as to the condition of the property or its suitability or zoning classification for any particular purpose… .

►*Purchase Price Allocation*

Fifth, the $700,000 purchase price for the sale is set forth in ¶ 8 **Purchase Price**, and provides that the purchase price was payable $300,000 at closing, and the remaining balance over 20 years pursuant to the terms of a promissory note. The note is secured by a second deed of trust "upon the real estate described herein" and by a lien on the stock. Exhibit "C" to the Agreement allocates $200,000 of the purchase price to the sale of the real estate; $100,000 to the covenant not to compete; and $400,000 to the sale of the stock.

►*Contingency*

Paragraph 15. **Sale of Stock and Real Estate Contingent on Each Other** provides that "should either the stock or real estate not sell then the agreement shall be void and Buyers shall not be obligated to buy and Seller shall not be obligated to sell just the real estate or just the stock described herein."

*Further Amendments to the Original Sale Agreement*

It is uncontroverted that the sale as contemplated by the January 11, 2011 Agreement did not close. Rather, prior to closing, the parties entered into an addendum, entitled "Stock Purchase And Real Estate Purchase Agreement Addendum" (the parties' Exhibits B and 103). This second agreement, dated February 4, 2011 and executed by the parties, referenced in the recitals, among other things, that the parties had entered into a Stock Purchase and Real Estate Purchase

Agreement dated January 11, 2011; that the parties desired to include additional real estate to the real estate purchase, in addition to that real estate listed on Exhibit "B" of the original contract; and that the parties desired to affirm the original agreement, which had not closed, and extend the date for closing. This second agreement contained a legal description of the additional real estate to be included, which Mr. Williams testified was the warehouses, not the 12.5 Acres.

Later, the sale closed, and Mr. Williams transferred his stock and deeds to the real estate referenced in the Agreement and Addendum. The parties executed a deed of trust on the warehouses to secure the note, but not on the 12.5 Acres. Title to 12.5 Acres remained in the name of H.D.W. Enterprises, Inc., which name the Buyers later changed to Williams Recycling, Inc.

*The Bankruptcy & Adversary Proceeding*

On September 12, 2012, Debtor Williams Recycling, Inc. filed a voluntary petition for Chapter 7 relief. Defendant Erlene Krigel was duly appointed as Trustee. The Debtor did not originally schedule the 12.5 Acres as an asset. The fact that the 12.5 Acres was titled in the Debtor's name became known at the 341 meeting that Mr. Williams attended. The Debtor then amended its schedules to list the 12.5 Acres. The Trustee filed a Notice to Sell the 12.5 Acres along with the other real estate and assets, and after an evidentiary hearing, the Court authorized the sale of all assets, including the 12.5 Acres, under 11 U.S.C. § 363(f)(4) (bona fide dispute). Mr. Williams both in his individual capacity and as Trustee of the Harvey Williams Family Trust then filed this Adversary Proceeding against the Debtor, Trustee, and three alleged lienholders, seeking a determination that the proceeds of the 12.5 Acres belonged to him and not to the

7

estate. [6][7] A second count in the complaint, concerning some personal property, was settled the day of the trial.[8]

At trial, both Mr. Williams and Mr. Russell testified that they had not intended the 12.5 Acres be part of the sale. Mr. Williams testified that $200,000 allocated as part of the sale price was a fair price for the real estate that was sold, and that he would have asked for more if the sale had included the 12.5 Acres. He further testified that he would have requested a deed of trust on the 12.5 Acres to further secure the note, had he indeed transferred the 12.5 Acres. The only other witness to testify, Mr. Russell, the CEO of Williams Recycling and the primary party who negotiated the sale on behalf of the buyers, testified credibly that he knew the 12.5 Acres existed, but that he understood the property was owned either by Mr. Williams or by another of Mr. Williams' corporations. At the conclusion of the trial, the parties requested the opportunity to submit post-trial briefs, after which the Court took the matter under advisement.

*Discussion*

Mr. Williams asks this Court to exercise its equitable powers and reform the Agreement under the doctrine of "mutual mistake" based on the uncontroverted testimony that neither buyer nor seller intended the 12.5 Acres be transferred as part of the sale. The Trustee in turn argues that there was no "mistake" – Mr. Williams intended to transfer his 12.5 Acres to the corporation in 1993, and the fact he "forgot" when he subsequently negotiated the sale is essentially

---

[6] For reasons that will be discussed in more detail below, the Court ruled at the beginning of the trial that the contracts were ambiguous and therefore that parol evidence could be admitted.

[7] Kloseks, LLC, the Missouri Department of Labor, and the IRS were also named as defendants in the complaint. Kloseks, LLC was dismissed on July 22, 2013. The Missouri Department of Labor and the IRS both have claims against the Debtor that Mr. Williams does not object to or contest. The claims would attach to the real property disputed in this adversary only if this Court finds it is owned by the Debtor. All of the parties in this action agreed to these facts in a stipulation filed with the Court on July 17, 2013. Accordingly, the Missouri Department of Labor and IRS did not participate in the trial or take a position as to whether Mr. Williams owned the disputed property.

[8] Williams also alleged that the Trustee had sold bailed property and that Williams was owed the proceeds of the property. The Court has already entered a partial judgment on that Count.

8

irrelevant. The Trustee points out that a sale of corporate stock as a matter of law transfers the underlying assets and liabilities of the corporation. The Trustee also argues that, even if there were a legally cognizant mistake, the mistake was not mutual because the new owners of Williams Recycling did not know there was a mistake.[9] The Court believes that the facts and the law support a determination that the 12.5 Acres was not transferred as part of the sale for the reasons stated below.

The parties agree that Missouri law governs whether the contract should be reformed on the grounds of mutual mistake. Under Missouri law, a mutual mistake occurs when both parties, at the time of contracting, share a misconception about a basic assumption or vital fact upon which they based their bargain. *Thompson v. Koenen*, 396 S.W. 3d 429, 434 (Mo. App. W.D. 2013). This is normally a question of fact. *Id.; see also Husch & Eppenberger, LLC v. Eisenberg*, 213 S.W.3d 124, 134 (Mo. App. E.D. 2006) (cites omitted).

Trial courts can reform a written instrument only upon clear, cogent, and convincing evidence that leaves no room for reasonable doubt. *Ethridge v. Perryman*, 363 S.W.2d 696, 698 (Mo. Banc 1963). This degree of proof relates not only to the existence of a mutual mistake, but also to the establishment of the actual agreement allegedly made. The party seeking reformation must show that (1) a preexisting agreement between the parties affected by the proposed reformation is consistent with the change sought; (2) a mistake was made in that the deed was prepared other than as agreed; and (3) the mistake was mutual, i.e., common to both parties. *Id.* To establish a mutual mistake in an instrument, it is not necessary to show that the parties had agreed upon any particular words or language to be used in the instrument, but it is sufficient to show that they agreed to accomplish a particular objective by the instrument, and that such

---

[9] In addition, the Trustee argued laches in its answer but did not argue this defense at trial.

9

instrument, as executed, is insufficient to effectuate their intention. *Everhart v. Westmoreland*, 898 S.W.2d 634, 637 (Mo. App. W.D. 1995).

The mistake may be established by direct testimony from the parties or from circumstantial evidence. *Everhart*, 898 S.W.2d at 637-38. If the mistake is established by direct testimony, this testimony must establish the mistake in an "entirely exact and satisfactory" manner. *Mercantile Bank of Sikeston v. Moore*, 935 S.W.2d 762, 766 (Mo. App. S.D. 1996). Circumstantial evidence will establish a mutual mistake "provided that the natural and reasonable inferences. . . clearly and decidedly prove the alleged mistake." *Everhart*, 898 S.W.2d at 638. In reviewing the evidence, a court should consider factors such as "the wording of the contract as signed by the parties, the relationship of the parties, the subject matter of the contract, the usages of the business, the circumstances surrounding the execution of the contract, and its interpretation by the parties." *Id*.

Finally, the Missouri Supreme Court directs us that reformation of a contract based on mutual mistake is an "extraordinary remedy and should be granted with great caution and only in clear cases." *Ethridge v. Tierone Bank*, 226 S.W.3d 127, 132 (Mo. banc 2007).

Turning to the evidence:

In this case, the Court finds, based on the testimony as well as sale documents, that Mr. Williams as seller and Mr. Russell as buyer did not intend that the 12.5 Acres be included in the sale of Mr. Williams' stock along with the other real estate and assets sold. The uncontroverted evidence is that the Agreement was drafted and executed to accomplish the sale of the stock and other real estate and assets associated with operation of the business (warehouses and recycling plant), and that the Agreement did not list the 12.5 Acres as an asset either included in or excluded from the sale. The uncontroverted evidence is that both Mr. Williams and Mr. Russell

made a mistake, in that neither of them thought the sale of the stock included the 12.5 Acres. Rather, the testimony as well as the quoted provisions of the Agreement show that the parties intended for the buyer to acquire sufficient assets to operate the Williams Recycling business; the fact that the parties later added other real estate – but not the 12.5Acres – when they executed the Addendum to the sale agreement is additional evidence of that intent.

Furthermore, there was no evidence controverting Mr. Williams' credible testimony that $200,000 was a fair price for the real estate that was sold, or that the parties did not execute a deed of trust on the 12.5 Acres to otherwise secure the balance of the purchase price. There was no evidence that – pursuant to the provisions of the Agreement regarding title policies and inspection – that Mr. Russell paid for a title policy on the 12.5 Acres, let alone inspected it. The Court finds this evidence "clear, cogent an convincing, and concludes that this case is one of those "clear cases" in which the sale contract should be reformed to clearly exclude the 12.5 Acres from the sale on the grounds of mutual mistake.

Nonetheless, the Trustee contends that because Mr. Williams intentionally transferred the 12.5 Acres to his corporation in 1993, he should have known the property was an asset of Williams Recycling when he transferred the stock in 2011, and therefore cannot now argue he made a mistake. This argument does not succeed as a matter of law.

The source of a mistake does not control whether a party is entitled to contract reformation. *Elton v. Davis*, 123 S.W.3d 205, 213 (Mo. App. W.D. 2003); *St. Louis County Nat. Bank v. Maryland Cas. Co.*, 564 S.W.2d 920 (Mo. App. 1978). In *St. Louis County National Bank v. Maryland Cas. Co.*, the Missouri Court of Appeals held that when an insurance agent made declarations to the parties regarding who the loss payee under the policy would be, but the agreement did not reflect the proper payee, the agreement should be reformed to conform to the

11

parties' intention. 564 S.W.2d at 926. The reason the agreement set forth in the policy was different than what the parties agreed to was irrelevant. *Id*. The fact remained that all parties agreed the wording in the contract was a mistake. *Id.* "[T]he source of the mistake is not relevant; it is the fact of the mistake which empowers the court of equity to act." *Id*.

Here, the source of the mistake is the fact that Mr. Williams forgot he transferred the 12.5 Acres to his corporation almost 20 years before selling the business. Mr. Williams and Mr. Russell both agree that the 12.5 Acres was not part of the business, was not used by the business, and was not intended to be transferred when the business was sold. How the mistake happened thus does not change the fact that one happened, which is what empowers this Court as a court of equity to act.

The Trustee's two other arguments against reformation similarly fail. First, the Trustee argues that because the parties understood the Agreement to encompass a sale of the corporate assets, the mistake is one of the parties' legal understanding of "stock purchase," rather than a mistake of fact. If a mistake of legal understanding, then courts hold that such a mistake does not subject the agreement to reformation. *E.g., Cardinal Partners, LLC v. Desco International Co., LLC*, 301 S.W.3d 104, 110 (Mo. App. E.D. 2010).

The Court believes the Trustee's argument flows from a faulty view of the facts. There is no evidence that the Agreement was solely a "stock purchase." Rather, the parties testified and the Agreement provides for in essence a "double deal" – a sale of both the stock (and certain personal property) and certain described real estate. Indeed, the Agreement provides that the sale is void unless both parts of the deal are completed. The fair interpretation of this requirement coupled with the non-compete and mentoring clauses leads the Court to conclude that the Agreement is the transfer of the business known as Williams Recycling, not simply a transfer of

assets and liabilities associated with the stock. This conclusion is further supported by the testimony from Mr. Williams and Mr. Russell indicating that both parties intended the sale to be a sale of a business.

The question, then, as to whether there was a mistake returns to what the parties intended to transfer when they transferred the business. The 12.5 Acres was not part of the business, was never used in the business, and was never intended to be part of the business. The fact that the Agreement included specific descriptions of certain real estate, notably omitting the 12.5 Acres, further convinces the Court that this mistake is precisely the type of mistake that equity requires this Court to reform.

Finally, the Trustee argues that because Mr. Russell did not know the 12.5 Acres was titled in the corporate name and that Mr. Williams did (but forgot) means the mistake cannot be mutual. As stated above, however, the source of the mistake is not relevant to the Court's decision as to whether there was a mistake. The 12.5 Acres is not part of the business and neither party intended it to be. Neither party knew that the 12.5 Acres was arguably being transferred along with the other real estate; therefore the mistake was mutual. In sum, for all these reasons, the Court concludes that Mr. Williams has met his burden of proving that the Agreement should be reformed to exclude a sale of the 12.5 Acres.

As a final matter, there is another ground – easier than reformation -- on which to determine the 12.5 Acres do not belong to the Debtor. This is a ground not raised by Mr. Williams but which flows as a natural consequence out of the Trustee's arguments.

As noted above, the Trustee argues that the Agreement is unambiguous, and that the fact Mr. Russell was unaware of the 12.5 Acres is irrelevant because the parties "understood that this purchase included **all** of the assets and liabilities of the corporation… ." (emphasis in original).

13

Actually, however, there is no evidence that such was the parties' intent. The Agreement could be considered to be ambiguous concerning whether the parties intended to include all assets; in particular, the parties divvied up certain of the personal property that would otherwise transfer automatically with a sale of stock and otherwise later executed an Addendum adding another asset to the purchase. Under this light, the parties to the Agreement testified (without objection) to their intent, leaving the Court with the ability to construe and interpret the Agreement without the need to reform it. And, a fair reading of the Agreement, particularly as supplemented by the testimony of the two parties, is that the parties intended, one, that the stock be sold as well as the business and certain of the personal property assets that went along with it, and, two, that certain real estate used in the business be sold as well. That real estate did not include the 12.5Acres because it was not part of the business being sold.

It is therefore the ORDER of the Court that Judgment be entered in favor of Plaintiffs; that the liens of the other defendant claimed lienholders do not attach; and that the 12.5 Acres (or its proceeds, as the case may be), are set aside to Plaintiffs; and that the Agreement is reformed or interpreted as necessary to so provide. This being a final judgment, each party is to bear its own costs.

Dated this 23rd day of December 2013.

/s/ Cynthia A. Norton

UNITED STATES BANKRUPTCY JUDGE

EXHIBIT A:

All that part of the South half (S ½) of the Southeast Quarter (SE ¼) of the Northwest Quarter (NW ¼) of Section Seventeen (17), Township Sixty-four (64), Range Thirty-five (35), lying North of the right of way of the Wabash Railroad, except a tract in the Northwest Corner thereof Eight (8) rods North and South by Forty-two (42) rods East and West by Three and Eighty-two (3.82) chains North and South, all in the City of Maryville.